# UNITED STATES COURT OF APPEALS

## FOR THE ARMED FORCES

——————————

## UNITED STATES

Appellee

**v.**

## Scott A. MEAKIN, Lieutenant Colonel

United States Air Force, Appellant

### No. 18-0339

No. ACM 38968

Argued January 23, 2019—Decided May 7, 2019

Military Judges: Joshua Kastenberg and
Natalie D. Richardson

For Appellant: *Major Mark C. Bruegger* (argued); *Major Allen S. Abrams* (on brief); *Lieutenant Colonel Anthony D. Ortiz.*

For Appellee: *Captain Michael T. Bunnell* (argued); *Lieutenant Colonel Joseph Kubler, Colonel Julie L. Pitvorec,* and *Mary Ellen Payne*, Esq. *(*on brief).

Judge RYAN delivered the opinion of the Court, in which Chief Judge STUCKY, and Judges OHLSON, SPARKS, and MAGGS, joined.

——————————

Judge RYAN delivered the opinion of the Court.

Appellant is a lieutenant colonel in the United States Air Force accused of transmitting obscenity over the internet by describing and encouraging the sexual exploitation and sexual abuse of children. A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of two charges and seventeen specifications of conduct unbecoming an officer and a gentleman, in violation of Article 133, UCMJ, 10 U.S.C. § 933 (2012). Consistent with his pleas, he was acquitted of one specification of conduct unbecoming an officer and a gentleman, in violation of Article 133, UCMJ. He was sentenced to confinement for twenty

months, forfeiture of all pay and allowances, and dismissal from the service.[1]

The AFCCA affirmed the findings and sentence. We granted review to determine:

> Whether Appellant's conviction for engaging in anonymous, private, and consensual communications with an unknown partner(s) in the privacy of his home was legally sufficient.

Finding no violation of Appellant's constitutional rights, we hold that his conviction was legally sufficient and affirm.

## I. Facts

Using the pseudonym "John Jones," Appellant engaged in a series of online conversations where he described in lurid detail the abuse, molestation, and rape of children with individuals through email, chat rooms, and instant messaging. At no time did Appellant provide his actual name, reveal that he was a member of the United States Air Force, or disclose his status as a commissioned officer. Appellant did not use a government computer to facilitate these conversations nor was there evidence that he sent the emails or messages from anywhere other than his private, off-base home. Appellant endeavored to keep his discussions secret, though there was no way to discern what happened to his emails or messages once he sent them.

Unbeknownst to Appellant, one of his online "friends" was actually Todd Martin, a detective working in the Internet Child Exploitation Unit of the Holton Regional Police Service in Ontario, Canada. Detective Martin created a profile on a pornographic website under the username "daddydaycare80," and posed as a father who was offering

---

[1] The United States Air Force Court of Criminal Appeals (AFCCA) denied Appellant relief from his claims that the speech underlying his convictions was protected by the First Amendment. Upon finding an error in the Addendum to the Staff Judge Advocate's Recommendation, as well as a violation of Article 12, UCMJ, 10 U.S.C. § 812 (2012), the AFCCA set aside the convening authority's action and ordered new post-trial processing. Subsequently, the convening authority approved nineteen months and fifteen days of confinement, and otherwise approved the adjudged sentence.

his minor daughter for sexual exploitation. Appellant, under the username "dadmangles" met "daddydaycare80" in a chat room labeled "incest." The two exchanged instant messages in the chat room for approximately half an hour, and, among other things, discussed sexually assaulting a very young (three- or four-year-old) girl as well as forcing each of their minor daughters to perform oral sex. The conversation moved from the chat room to email and continued for several months, with Appellant using his love2ski4@yahoo.com address and "daddydaycare80" using a daddydaycare80@gmail.com address.

During the course of these email exchanges, Appellant communicated, inter alia: requests for nude photographs of daddydaycare80's three- or four-year-old daughter; offers to let daddydaycare80 sexually exploit Appellant's own nine-year-old daughter (he did not in fact have a daughter); detailed descriptions of forcing both daughters to perform oral sex; suggestions that the adults hire a prostitute to engage in sex acts with daddydaycare80's daughter; descriptions of urinating inside of the child; and discussions of forcing the child to eat food containing semen in order to acclimate her to the taste. Appellant also sent a photograph of an erect penis to "daddydaycare80," asking if his daughter would like it. While "daddydaycare80" did not actually have a daughter, Appellant clearly believed that "daddydaycare80" was offering a real child for sexual exploitation. The communications with "daddydaycare80" formed the basis for Specification 1.

This series of internet correspondence ultimately culminated in an agreement to meet in person. Appellant planned to fly to Toronto to meet with daddydaycare80 and his minor daughter. The two would then bring the child to a motel and sexually exploit her. While they discussed both the exploitation and the travel plans in some detail, Appellant ultimately backed out and terminated the conversation, stating: "Hey man, I'm not going to come. I'm all talk man. I could never do what I've been saying. Just like to talk."

Detective Martin then traced Appellant's IP address and forwarded the information to the Department of Homeland Security (DHS). Based on the information provided, DHS

subsequently obtained a search warrant, executed a search of Appellant's residence, and seized numerous personal electronic devices. During a warned interview with OSI, Appellant admitted to being responsible for the chats, using the identity "John Jones," and owning both the love2ski4@yahoo.com account and the "dadmangles" profile from the pornographic website.

A search of the seized personal electronic devices yielded a lengthy record of internet messages between Appellant and "daddydaycare80" as well as records of emails sent between Appellant and seventeen additional unique online identities: (1) "Austin Hickey," (2) "bjgoodson," (3) "Chronic Bator," (4) "foodspunker," (5) "funninezerosix," (6) "jes120652," (7) "Jpunani3607," (8) "grobbles77," (9) "maggiemos13," (10) "meiert69," (11) "mondyman1969," (12) "rcj303," (13) "std4uanme," (14) "steve636," (15) "stwiggy1988," (16) "taylor23cd," and (17) "wxlp97xqc." Emails from Appellant described in great and graphic detail the sexual abuse of minors, as well as suggestions that the unknown users engage in the sexual abuse of their minor children. Following a pattern similar to the electronic "conversations" with "daddydaycare80," the emails from Appellant included, but were not limited to: requests for photographs of nude children; descriptions of children crying and whimpering during intercourse and choking on Appellant's penis; descriptions of getting children drunk and forcing them to perform oral sex; and descriptions of raping children. The descriptions were vivid. The evidence adduced from these additional conversations formed the basis for Specifications 2 through 17 and the Specification of the Additional Charge.

## II. Procedural History

Prior to his court-martial, Appellant moved to dismiss the charges and their specifications on the basis that his internet communications were private and thus constitutionally protected. While not contesting that the writings were obscene, Appellant relied primarily on *Stanley v. Georgia*, 394 U.S. 557 (1969), and *Lawrence v. Texas*, 539 U.S. 558 (2003), to assert that he had a fundamental right to engage in sexual conduct and expression within the privacy of his own

home, and that "[c]riminalizing the communication within [his] private conversations cuts against the foundation of [his] fundamental right" to privacy. The military judge denied the motion to dismiss, noting that the Government alleged that Appellant's written communications in the online group chat and emails were distributed outside the privacy of his home or private space, and thus fell outside of the First Amendment protection afforded by *Stanley*. While citing *Miller v. California*, 413 U.S. 15 (1973), and *United States v. Moore*, 38 M.J. 490 (C.A.A.F. 1994), rather than *Lawrence*, the military judge also determined that the personal relationship between the parties was unknown, and the language was of a nature to encourage and normalize child exploitation and molestation.

On appeal to the AFCCA, Appellant argued, inter alia, that his convictions should be set aside because the evidence was both legally and factually insufficient. Specifically, as relevant to the granted issue, Appellant renewed his argument that his speech over the internet was protected under *Stanley* and the First Amendment because it was private, anonymous, and apparently consensual. He further claimed that this "speech" could not form the basis for an Article 133, UCMJ, offense because there was no evidence that his communications adversely affected the military or incited illegal activity. He asserted that the AFCCA should apply the heightened "clear and present danger" test articulated in *United States v. Hartwig*[2] when evaluating an Article 133, UCMJ, offense involving an officer's private speech. Appellant argued that a reasonable officer would not have anticipated that his private, anonymous, and consensual email communications would pose a "clear and present danger" to his status as an officer.

---

[2] 39 M.J. 125, 128 (C.M.A. 1994) ("When an alleged violation of Article 133 is based on an officer's private speech, the test is whether the officer's speech poses a 'clear and present danger' that the speech will, 'in dishonoring or disgracing the officer personally, seriously compromise[] the person's standing as an officer.'" (citation omitted)). But this test only applies when the officer's private speech is entitled to First Amendment protection. *Roth v. United States*, 354 U.S. 476, 486 (1957); s*ee Moore*, 38 M.J. at 492–93.

The AFCCA declined to expand *Stanley's* holding to cover Appellant's conduct, observing that "the zone of privacy *Stanley* protected does not extend beyond the home," and it "did not create a right to receive, transport, or distribute obscene material." Because the AFCCA determined that Appellant's indecent speech was not entitled to First Amendment protection, rather than applying *Hartwig's* "clear and present danger" test, it simply asked whether Appellant's online chats and emails were legally sufficient to constitute conduct unbecoming an officer. Noting that both private speech and private conduct—even that which would be constitutionally protected in civilian society—could constitute an offense under Article 133, UCMJ, it determined that Appellant's conduct was disgraceful to himself and the reputation of the military and affirmed the conviction.[3]

### III. Discussion

Before this Court, Appellant again argues that his conviction is legally insufficient. First, citing *Stanley*, he argues that his conviction for private, noncommercial communications with willing partners, even if indecent, is legally insufficient because he sent the communications from his private home. Second, citing *Lawrence*, he claims his conviction for these same internet writings is legally insufficient because the writings are protected by his fundamental right to privacy under the Fourteenth Amendment's Due Process Clause. Lastly, he asserts that the charged violations of Article 133, UCMJ, are legally insufficient because a reasonable officer would not have anticipated that private, anonymous, and consensual email communications would pose a "clear and present danger" to his status as an officer. For the reasons set forth below, we disagree.

A.

This Court reviews questions of legal sufficiency de novo. *United States v. Kearns*, 73 M.J. 177, 180 (C.A.A.F. 2014). The test for legal sufficiency is whether, considering the evi-

---

[3] As previously noted, *see supra* note 1, the AFCCA set aside the convening authority's action and ordered new post-trial processing, and the convening authority approved nineteen months and fifteen days of confinement and otherwise approved the adjudged sentence.

dence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *United States v. Green*, 68 M.J. 266, 268 (C.A.A.F. 2010). In order to convict Appellant for conduct unbecoming an officer and a gentleman under Article 133, UCMJ, as charged in this case, the prosecution needed to prove beyond a reasonable doubt: (1) that the accused wrongfully and dishonorably communicated, in writing, certain indecent language; and (2) that, under the circumstances, these acts constituted conduct unbecoming an officer and a gentleman. *Manual for Courts-Martial, United States* pt. IV, para. 59.b. (2012 ed.) (*MCM*). Given the obscene nature of the speech at issue in this case, all of which was presented to the trier of fact, we easily conclude that the charge and specifications in this case were legally sufficient.

B.

The primary thrust of Appellant's first two arguments is that the charges are legally insufficient because the conduct at issue was private and thus constitutionally protected by either the First Amendment and/or the Due Process Clause of the Fourteenth Amendment. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. As related to Appellant's argument, the Fourteenth Amendment[4] provides that no state may "deprive any person of life, liberty, or property, without due process of law" and has been interpreted by the Supreme Court to contain a substantive due

---

[4] Of course, it is the Due Process Clause of the Fifth Amendment rather than that of the Fourteenth Amendment that applies to the military justice system, an instrument of the federal government rather than the states. *United States v. Bess*, 75 M.J. 70, 74 n.3 (C.A.A.F. 2016). However, the Fifth Amendment also provides that no person shall be "deprived of life, liberty, or property, without due process of law" and there is no reason to expect that the *general* scope of the protections would be different in this context. U.S. Const. amend. V; *see United States v. Marcum*, 60 M.J. 198, 206–08 (C.A.A.F. 2004) (conducting an analysis of the constitutionality of Article 125, UCMJ, 10 U.S.C. § 925, under the test articulated by *Lawrence*). We will, therefore, discuss the issue utilizing the language set forth in the Supreme Court's decision in *Lawrence*.

process protection for a liberty interest to form intimate, meaningful, and personal bonds that manifest themselves through sexual conduct. U.S. Const. amend. XIV; *Lawrence*, 539 U.S. at 564.

It is well-settled law that obscenity is not speech protected by the First Amendment, regardless of the military or civilian status of the "speaker." *United States v. Williams*, 553 U.S. 285, 288 (2008); *United States v. Wilcox*, 66 M.J. 442, 447 (C.A.A.F. 2008). Appellant concedes that the writings that formed the basis for the charges and specifications in this case constituted obscenity.

Moreover, at trial, the parties agreed that para. 89 of pt. IV of the *MCM* offered the appropriate definition for "indecent." That definition states:

> "Indecent" language is that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar, filthy, or disgusting nature, or its tendency to incite lustful thought. Language is indecent if it tends reasonably to corrupt morals or incite libidinous thoughts. The language must violate community standards.

*MCM* pt. IV, para. 89.c. This Court has long held that "indecent" is synonymous with obscene. *Moore*, 38 M.J. at 492. Obscenity can consist of visual images or language: "there is no distinction as to the medium of the expression when dealing with obscene material. Obscenity can manifest itself 'in conduct . . . or in the written and oral description of conduct.'" *United States v. Meakin*, No. ACM 38968, 2017 CCA LEXIS 476, at *10–11, 2017 WL 3311199, at *4 (A.F. Ct. Crim. App. July 14, 2017) (citing *Kaplan v. California*, 413 U.S. 115, 119 (1973)). And no one, including Appellant, disputes that the speech in this case conveyed patently offensive, "repugnant sexual fantasies involving children" (from Appellant's brief) that appealed, and was intended to appeal, to the prurient interest. Such speech is not protected by the First Amendment. *Miller*, 413 U.S. at 24.

1.

Appellant nonetheless argues that his obscenity, transmitted from his home computer to anonymous third-parties via online instant messages and emails, is analogous to hav-

ing a private discussion within the seclusion of his home and thus protected under *Stanley*. We disagree.

The analogy is entirely inapt. First, the zone of privacy that *Stanley* protects does not extend beyond the confines of the home. *United States v. Bowersox*, 72 M.J. 71, 76 (C.A.A.F. 2013) (" 'The Court has consistently rejected constitutional protection for obscene material outside the home.' " (quoting *United States v. Orito*, 413 U.S. 139, 141–42 (1973))). In this case the obscenity was both transported and distributed via the internet. The Supreme Court has consistently rejected the idea that "the right to possess obscene material in the privacy of the home . . . creates a correlative right to receive it, transport it, or distribute it." *Orito*, 413 U.S. at 141. Moreover, such transmissions constitute "travel" in interstate commerce. *United States v. Pierce*, 70 M.J. 391, 395 (C.A.A.F. 2011) ("Every court to address the issue agrees with the unremarkable proposition that the Internet is a means of interstate commerce."); *see*, *e.g.*, *United States v. Kammersell*, 196 F.3d 1137, 1138–39 (10th Cir. 1999) (a defendant's transmission of threatening communication from his computer via "instant message," to recipient's computer in the same state, was sufficient to satisfy jurisdictional element of interstate commerce regardless of where the recipient resided). Neither transmission nor distribution of obscenity in interstate commerce bears any resemblance to *Stanley*'s protection of the mere private possession of obscene material within the confines of one's home.

Second, *Stanley* is predicated on both the sanctity of the home and solitude. *See* 394 U.S. at 565 ("a State has no business telling a man, *sitting alone* in his own house, what books he may read or what films he may watch" (emphasis added)). The Supreme Court has consistently declined to extend First Amendment protection where obscenity is physically taken outside of the home, even where it is intended for private, noncommercial purposes. *See United States v. Thirty-Seven (37) Photographs*, 402 U.S. 363, 376 (1971). Unlike *Stanley*, Appellant's obscenity was not contained within his home for consideration within his own mind. Instead, he produced, preserved, and transmitted his written obscenities to seventeen separate individuals.

While *Stanley* notes that our "whole constitutional herit-age rebels at the thoughts of giving government the power to control men's minds," 394 U.S. at 565, there is a stark dif-ference between thinking thoughts within the confines of the home and reaching outward to share obscenity and encour-age strangers across the world to sexually abuse their chil-dren. As the AFCCA ably explained, reliance on extending *Stanley* to this case is misplaced:

> In *Stanley v. Georgia*, 394 U.S. 557, 568 (1969), the Supreme Court found a limited right to possess ob-scene material in the privacy of one's home. . . . Since issuing this opinion, however, the Supreme Court has made clear that its holding in *Stanley* is a narrow one. *See United States v. Reidel*, 402 U.S. 351. 357 (1971). . . . *Stanley* emphasized the free-dom of thought and mind in the privacy of the home; *Stanley* did not create a right to receive, transport, or distribute obscene material.[5]

*Meakin*, 2017 CCA LEXIS 476, at *10, 2017 WL 3311199, at *4. This Court has repeatedly limited *Stanley* to its facts and we see no reason to depart from our previous rulings. *See, e.g., United States v. Rollins*, 61 M.J. 338 (C.A.A.F. 2005); *Hartwig*, 39 M.J. 125; *Moore*, 38 M.J. 490.

2.

Appellant's attempt to rely on *Lawrence* is similarly flawed. In *Lawrence* the Supreme Court overruled *Bowers v. Hardwick*, 478 U.S. 186 (1986), and held that a statute crim-inalizing homosexual sodomy violated the Due Process Clause of the Fourteenth Amendment. 539 U.S. at 564. *Lawrence* grounded its analysis in a fundamental liberty in-terest to form intimate, meaningful, and personal bonds that manifest themselves through sexual conduct. *Id.* at 567. *Lawrence* did not purport to include any and all behavior touching on sex within its purview, and did not "conclude that an even more general right to engage in private sexual conduct would be a fundamental right." *Seegmiller v.*

---

[5] We acknowledge that it is unclear how people are to enjoy the protection that *Stanley* carves out for privately possessing ob-scenity in one's home when it remains criminal to receive, transport, or distribute it. *See Orito*, 413 U.S. at 141.

*LaVerkin City*, 528 F.3d 762, 771 (10th Cir. 2008) (no protection for off-duty sexual conduct of police officers that violated department ethics guidelines); *see also Erotic Service Provider Legal Education and Research Project v. Gascon*, 880 F.3d 450, 455–57 (9th Cir. 2018) (no fundamental due process right to engage in prostitution).

In essence, Appellant seeks to place distributing or transmitting obscenity to individuals whose true names he did not even know and whom he had not met, on par with the liberty interest and fundamental right to form intimate, meaningful, and personal bonds that manifest themselves through sexual conduct described in *Lawrence*. We agree with the court in *United States v. Stagliano*, which observed, when upholding statutes that criminalize the interstate trafficking of obscenity against a challenge similarly grounded in *Lawrence*, that:

> What is evident from the Supreme Court's decision is its intent to prevent the state from burdening certain intimate, consensual relationships by criminalizing the private sexual acts that are instrumental to those relationships. In defining the contours of the liberty interest, the Supreme Court made a point to note that the statutes challenged in *Lawrence* "seek to control a personal relationship that . . . is within the liberty of persons to choose without being punished as criminals." 539 U.S. at 567. The defendants, in effect, demean [*Lawrence*'s] liberty interest by defining it as a right to sexual privacy, when it is really about the right to form meaningful, personal bonds that find expression in sexual intimacy.

693 F. Supp. 2d 25, 38 (D.D.C. 2010) (ellipsis in original).

We reject Appellant's argument that distributing or transmitting obscenity that encourages, describes, and revels in the sexual exploitation of children over the internet falls within the fundamental liberty interest recognized in *Lawrence*.

### C.

Finally, Appellant argues that even if his conduct wasn't constitutionally protected (and it was not) the charge of Article 133, UCMJ, was legally insufficient because he (1)

couldn't know that private consensual communications were illegal or would pose "a clear and present danger" to his status as an officer, and (2) there was "no connection at all between Appellant's speech and the military mission." We are unpersuaded.

First, the "clear and present danger test" only applies to speech that is protected by the First Amendment, not obscenity. *See supra*, note 2.

Second, this Court has previously held an officer's conduct need not violate other provisions of the UCMJ or even be otherwise criminal to violate Article 133, UCMJ. *United States v. Lofton*, 69 M.J. 386, 388 (C.A.A.F. 2011). "The gravamen of the offense is that the officer's conduct disgraces him personally or brings dishonor to the military profession such as to affect his fitness to command the obedience of his subordinates so as to successfully complete the military mission." *Id.* (internal quotation marks omitted) (citation omitted); *see also Parker v. Levy*, 417 U.S. 733, 763 (1974) (Blackmun, J., with whom Burger, C.J., joined, concurring) ("[T]here are things which are malum in se and . . . things which are merely malum prohibitum. . . . In military life there is a higher code termed honor, which holds its society to stricter accountability; and it is not desirable that the standard of the Army shall come down to the requirements of a criminal code." (internal quotation marks omitted) (citation omitted)).

Third, this Court has long held that "[t]he conduct of an officer may be unbecoming even when it is private." *Moore*, 38 M.J. at 493. Indeed, we have recognized that "[c]onduct which is entirely unsuited to the status of an officer and a gentleman often occurs under circumstances where secrecy is intended." *United States v. Norvell*, 26 M.J. 477, 478 (C.M.A. 1988). Conduct that violates Article 133, UCMJ, may consist of an "*action or behavior in an unofficial or private capacity* which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer." *MCM* pt. IV, para. 59.c.(2) (emphasis added).

Finally, we have long approved the enforcement of military customs and usages by courts-martial to narrow the otherwise broad scope of Article 133, UCMJ, *Parker*, 417

U.S. at 753, and it has historically been the case that officers are held to a higher standard of behavior. *See id.* at 743–45; *see also* William Winthrop, *Military Law and Precedents* 711 (2d ed., Government Printing Office 1920) (1895) ("So, this term ["Gentleman"] is believed to be used, not simply to designate a person of education, refinement and good breeding and manners, but to indicate such a gentleman as an *officer* of the army is expected to be. . . ." (emphasis added)).

This more exacting standard of conduct can be traced back at least to "the days of knighthood" where "knights were held to a higher standard of conduct than their fellow countrymen" in "the Court of Chivalry." James Snedeker, *Military Justice under the Uniform Code* 887 (1953). An examination of the British antecedents of our military law shows that the military law of Britain long contained remarkably similar language to the current Article 133, UCMJ. *Parker*, 417 U.S. at 745. In 1775, a conduct unbecoming article was adopted into the Articles of War. *Id.* at 745–46. And that language remained essentially unchanged from 1806, until it was enacted as Article 133 of the UCMJ in 1951. *Id.* The discussion to Article 133, UCMJ, further notes:

> There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty, unfair dealing, indecency, indecorum, lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet unrealistically high moral standards, *but there is a limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer . . . cannot fall without seriously compromising the person's standing as an officer . . . or the person's character as a gentleman.*

*MCM* pt. IV, para. 59.c.(2) (emphasis added).

This heightened standard for officers commands respect and obedience and preserves their ability to lead and command their subordinates. *Parker*, 417 U.S. at 743–45; *see also* Winthrop, *supra*, p. 13, at 710–11 (stating that the offense intended "to establish a higher standard of character and conduct for officers of the army"). An officer is called upon to be a leader as well as a warrior, which necessitates that commissioned officers are subject to stricter accounta-

bility for their actions. *Moore*, 38 M.J. at 493 (citing *Parker*, 417 U.S. at 765 (Blackmun, J., with whom Burger, C.J., joins, concurring)); *Fletcher v. United States*, 26 Ct. Cl. 541, 563 (1891), *rev'd sub nom. United States v. Fletcher*, 148 U.S. 84 (1893).

Unlike Article 134, UCMJ, which is applicable to all servicemembers, the plain text of Article 133, UCMJ, contains no reference to the military service. Rather, it is a personal offense committed by commissioned officers, cadets, or midshipmen that dishonors or disgraces them personally. Thus, even conduct that has no bearing on military discipline might establish the basis for an Article 133, UCMJ, charge. *See Fletcher,* 148 U.S. at 91–92 (finding that failure to pay certain debts was facially sufficient to establish the offense of conduct unbecoming an officer and gentleman).

In sum, even if it were the test, we readily reject Appellant's claim that a reasonable officer, by reference to either plain common sense or the customs of the service, would not have anticipated that transmitting speech that describes, encourages, and normalizes child sexual exploitation and molestation in graphic detail would surpass the "limit of tolerance based on customs of the service and military necessity below which the personal standards of an officer . . . cannot fall without seriously compromising the person's standing as an officer . . . or the person's character as a gentleman." *MCM* pt. IV, para. 59.c.(2). We further reject Appellant's claim that a connection to the military mission is required to prosecute a violation of Article 133, UCMJ. As such, under the facts of the case, we hold that the evidence was legally sufficient.

## IV. Judgment

The judgment of the United States Air Force Court of Criminal Appeals is affirmed.